Good morning, and may it please the Court. I'm David Weinstein of Weinstein, Eisen, Weiss, LLP. We're representing our own interests concerning this appeal about the disparate, unequal, frequent We don't need to consider this a pro se case, though. You got me on it. All right. At least I hope not. Perhaps we should revisit that when we're finished. All right. The matter comes before you on the issue of unequal and disparate treatment being afforded. Administrative claims in a bankruptcy case that are indisputably equally ranked. With me, for Your Honor's edification, is Sharon Weiss at the Council table, also a representative of the firm, but I will handle all argument with the Court. Counsel, isn't the threshold issue the question of whether the you were timely in raising this issue? Well, that question has been raised in kind of an odd manner, Your Honor. The appellees have never argued that there was no identification or no articulation of issues. In fact, they've made the point, which I do agree with, that while we were, or I was, less than articulate at the original bankruptcy court hearing, they've made the point that there was sufficient notice and we were there and we were argued and we argued and we were heard. When we got to the appellate panel, the issues arranged themselves as a noticing and due processing issue first. The bankruptcy appellate panel found that the noticing was adequate and that we didn't argue, which was not an argument that was made by the appellees and, in fact, they used the opposite point, which I agree with, although obviously I disagree with their conclusion about the point. So I have to say that the two sides of that issue are either that noticing was entirely inadequate, so we weren't able to articulate any meaningful arguments, but that's the fault of the notice, which would make the entire proceeding subject to a due process and voidness problem, which, of course, is indeed one of our arguments, or we did the best we could in terms of getting there and articulating the issues, and we have cited to you other Ninth Circuit cases that specifically, although there were other issues, of course, in those cases, but we cited to you cases that make the very point that in a bankruptcy context, and particularly in general case issues, which this is as opposed to a plaintiff versus defendant adversary proceeding, where exactly who is adverse to whom and exactly what issues are going to be in play, if you will, is not always so perfectly articulated as it is in a plaintiff versus defendant lawsuit. The standard for doing that is, in fact, viewed somewhat more flexibly. And this Court has specifically articulated that. So I don't think that we were all properly – our arguments were not properly handled, obviously, with due respect to the intervening appellate panel, to have essentially not reached any of the substantive arguments on a finding that there was adequate notice, particularly the way it came to them. Ginsburg. Counsel, you know we're reviewing actually what the bankruptcy court did. Indeed. Right. Yes. As if there – well, that was – in effect, Your Honor, that was kind of one of my points, but maybe I should articulate it differently. For that exact reason, this Court, in effect, looks past, as if the bankruptcy appellate panel had not spoken. If you take that out of it, you don't find the argument that Judge O'Scanlan asked me about anywhere. The appellees have not made it. The bankruptcy court in no ruling or – there's nothing that one can get from the bankruptcy court. Which argument are you referring to? Judge O'Scanlan asked me if we had – I hope I understood the question. Yes. I think I understood the question to be whether we had failed to make arguments sufficiently below so that they could be addressed by this appellate court. And what was your answer to that? And my answer is that we – if the notices was at all – we made the arguments the best we could, and the outcome of the issue has to either be that the notice was entirely insufficient to allow us to articulate reasonable arguments, in which case there's clearly a due process and voidness resolution, or we did the best we could, the issues were at least out there, and, yes, they can be fleshed out and handled more completely here. All right. Well, maybe we should get to the dispositive issue, which is the mootness question. We have a response from the Gill firm. Did you respond to our – Oh, we did, indeed, Your Honor. All right. For some reason it didn't get to my book, but that's all right. Well, it came in to mine late last night. Well, we – I mean, it hasn't arrived. Friday. We provided it last Friday, which was the deadline. Well, we'll – that's fine. We'll have a chance to look at it. But why isn't this moot under 364E? Let me go right to that, and particularly if Ron hasn't had a chance to read our letter brief. The Court's order asks about 364E and Adams-Apple. This is the simplest and most direct answer. This is simply not a 364E issue. 364E and Adams-Apple are about postpetition claims and liens. And the language of the statute speaks to reversal, modification on appeal will not affect the – I have it in the letter brief. I don't have the precise, precise language of it. It will not affect the priority or enforceability of a claim or lien absent a stay. We are not speaking to the bank's postpetition – I'm sorry. I should say we don't attack the bank's postpetition claim or lien under any circumstances for money they actually lent. The – this is a – what we're attacking here is the second half of the transaction, if you will. The provision of money entitled the bank to a postpetition claim of whatever priority was awarded and a lien on the assets of the estate to secure that claim. The issue that we've brought before you is the inclusion in that order of how that money was going to be handled in a separate transaction and who was going to be entitled later to look to that fund. That has nothing to do with the enforceability, the creation enforceability and preservation of the lender's postpetition claim and postpetition lien. Adams Apple even speaks to and uses the term financing devices. Financing devices, financing provisions, financing terms has to do with the establishment of rights, claims, liens, securing claims. What we're attacking here is the separate creation of a fund with some of this loaned money to which only select administrative claimants could look later. That has nothing to do with protecting the repayment rights. Ginsburg-How can you separate out the amount that was loaned that was to be allocated to the trustee from the entire loan package? I mean, given the reality that most banks aren't interested in lending money to people in bankruptcy, that perhaps they, and I think you make this argument that the loan they were already in, they were in pretty far already, but to lend that additional money, they wanted to make sure that the construction was actually going to be completed. And so by funding up the completion of that through the part of the loan that was to be allocated for the trustee and his administrative costs and his professionals, it's part of the entire, you know, loan package of that, of the remainder of the construction  Well, with all due respect, Your Honor, there's really a very much of a bootstrap argument to that because, or bootstrap quality, I should say, because the payment of administrative expenses is entirely, as a normal matter, under the structure of the Code, is unrelated to postpetition financing in 364. But you had a unique situation here. You had an uncompleted construction project with an outstanding, you know, course of construction, well, construction loan. But it's actually not all that unusual in the sense that I think Your Honor might be using it. I mean, midstream interrupted commercial events occur all the time. And maybe they're not all condominium projects, but airline financing and hotel I'm asking this in the context of this particular loan by Comerica, which allocates But what I'm saying is that the administrative fund creation and the rights surrounding it was really a tag-on to the construction hammers and nails financing. That's the real core of the problem here, is that that was tagged on. At most, there's we think it's really five days, but at most, they've argued there's 16 days where they tagged on this management of the administrative expense fund to a series of lending transactions that really had to do with providing construction money for hammers and nails and other such true construction matters. And they brought on at the end this exclusionary or special treatment fund that puts an insulation or an encapsulation around money that's being loaned to the estate. And the case that we cited, and again, now I'm hearing that Your Honors didn't have a chance to read our papers yet, but we cited in our letter brief a case called Decker from the Appellate Panel, which relies on Spiritos from this Court. And specifically, and Decker is virtually on all fours, relying on Spiritos. Decker was a case where there was a sale in a 363M issue, and there was Ninth Circuit authorities specifically analogizing 363M and 364E. And there was a sale and a disposition of certain money to disputed secured creditors. And there was an appeal to this court or I'm sorry, there was an appeal to the BAP in Decker where the issue was the propriety of the disposition of the money out of escrow, not the sale transaction itself. And Decker specifically held that the – because of the principles coming out of S.S. Retail, which is another one of this Court's cases, where the remedy is simply the payment, repayment, or reallocation of money. And all the parties before the Court, remedies can be fashioned and it's not moot. The issue of disposition of funds is not moot, even though the issue of the sale would have been. And that case specifically cites the Spiritos, which is this Court's opinion at 992F2nd, I don't know if I can get the balance of the site for you, but it is in the letter brief. Spiritos was a case where the issue was whether a pension plan money belonged to the estate or not. The bankruptcy court held it wasn't. The debtor took the money and dissipated it. The determination that it wasn't estate money was challenged on appeal. The argument was made that it was moot because it had already been dissipated, and this Court said no. All that has to be done is restoring money, and in effect really was saying, I think, among other things, that you can't sort of create your own mootness by taking money and disposing of it. So all of this is more fully. Well, maybe this is a good time to let the other side respond, and then you can reuse the remainder of your time if you wish. Good morning, Your Honors. Joel Olkren representing Comerica. To address specifically the 364E issue and your issue on mootness, Mr. Bingham will address the other issues. I think that the observation about Comerica's loan that Judge Wardlow made is absolutely correct. I take it from Mr. Weinstein's comments that he conceives that my client has made the loan in good faith and that the recitals in the various orders, in paragraphs G in the order that was entered when Mr. Weinstein represented the debtor, which is exactly the same language as paragraph G in the order entered in connection with this appeal, that that language is, in fact, appropriately supported by the record based upon his concession. I will address further that he wants to share in the proceeds somehow in terms of ratting. Well, that's correct. And where I'm going with this is that the record is extremely clear that our client was very, very concerned at the continual cost overruns on this project. And if you look through the various financing documentation and the supplements and amendments to it and the fact that this was noticed and re-noticed and came up for hearing several times, we were so concerned about the misuse of these funds somehow or the fact that they might be deflected to a purpose other than the completion of this project that we wanted to make certain that the lawyers for the trustee and the other professionals for the trustee who were doing those things necessary to complete this construction would be paid. The monies were, in fact, deposited into an account which we retained as security interest. If that money is not used to pay those expenses, it comes back to my client. So, in effect, this is not fund – these are not funds that are essentially available for whomever might want to glom onto them. They're funds that were specifically allocated by virtue of the budgets and by virtue of the orders and by virtue of the financing documents to be used for the purposes of building out the project. And part of that is not just merely hammers and nails because you're dealing with a city. You're dealing with planning authorities. You're dealing with a lot of the other legal requirements to get the assets sold such as you've got condo units that are going to be sold. You have a bunch of issues that have to be addressed. And those interests have to be represented by lawyers and sales agents and other people who are being employed by the trustee for that purpose. So that's the reason that this is moot, Your Honor, because I don't know how you can go back. If, in fact, you take the assumption that under Section 364E, this financing and the entire package is not subject to attack at this point because there was no stay, then the portion of the package, which is, in fact, that money that's sitting in that account to which we have a security interest and we're entitled to get it back and it's not used for the purpose it's designated, I don't think that you can get an adequate remedy if you take that assumption to be correct. Do you want to say anything about that passage in 364A about affecting the validity? Yes. 364E, I believe it is. E. Yes. I meant to. Yeah. The code section basically says, does not affect the validity of any debt so incurred or any priority or lien so granted to an entity that extended such credit in good faith. He conceded the good faith issue, I believe. The orders that he presented recited that we had engaged in negotiation in good faith. It's clear that the same negotiation process was going on through the whole point in time so that we believe that the good faith issue has been disposed of by his concession a moment ago. The debt that we have and the liens that we have are defined by the loan agreements, and the loan agreements are very precise, and they create a security interest in that fund in addition to allocating the purposes for the debt. One of the things that happens in these complicated loan transactions, particularly as it gets to the point where this one got to, where there had been estimates given and blown, estimates given and blown, and we're continuing to run up against the wire where we're simply not going to get paid. You know, we're completing a project, but the amount to complete the project will not be capable of being paid back by the proceeds of the loan. So we are now protecting that in this context by saying we're only going to pay that which is necessary to complete the project, which includes the costs and expenses of the trustee who's now there managing the project and his counsel and the people who are working for him. There's a fellow by the name of Ken Rolke who is essentially the real estate advisor. These are the people who we're going to see get paid. When they submit an affidavit to us or when they submit a draw request, they have to say that this draw request is for these purposes and this is the line items down through that budget. Now, Mr. Weinstein had copies of that budget, I believe, going back to January 4th of this time period, and in the designation of what the money is going to be used for, the declaration of Mr. Gill said we need $800 and some thousand dollars for all of these expenses that relate to the trustee and his professionals, including Mr. Rolke, who is not a lawyer but who is, in fact, a real estate expert. And that's the reason I believe it's smooth, Your Honors. I don't think you can go in and redo my client's loan documents. Roberts. Thank you, counsel. Mr. Bingham. Thank you, Your Honors. May it please the Court, John Bingham of Danning, Gill, Diamond & Coleridge, appearing on behalf of the trustee. I would just briefly, I think this number of items have been briefed to a great extent, but I'd briefly cover a few moments, a few items. First, adequate and timely notice. I'd like to cite from the record AR-677 where Judge Russell said, I'm going to grant the motion. I think it has been fairly noticed. I think everyone knew or should have known exactly what was going on, as I certainly did. Appellant has experienced bankruptcy counsel and acting as counsel for the debtor in possession for approximately a year prior to the order at issue. If he was surprised by the proposed financing order, it was not because the terms were not made clear. It was not because the terms were not submitted in a timely manner to creditors and other interested parties to examine. The bankruptcy court in that regard, having heard the argument of the appellant, concluded that it was clear. We next get into the issue of the trustee's duties. The appellant has repeatedly argued that somehow what the trustee did was wrong, that somehow something should have been done differently. But as we know from the record, we can look at what Mr. Prober said on behalf of his junior secured client, a client that had a $4 million loan behind Co-America. We can't ask a trustee to come in and finish a construction project without making provision for him to get paid for his work or to get paid for the work of his professionals incident to that project. That's at the record at 664, the argument at hearing. Then Mr. Simon Aaron, who represented one of the larger unsecured creditors, said we would support the trustee's request. At this stage of the proceedings, it appears that the best that these unsecured creditors can hope for is that, in fact, the project is completed as quickly as possible, the units are sold as quickly as possible, so that we can stop the accrual of interest which is driving the estate further and further upside down. Roberts. I think we understand your position with respect to those issues. Is there anything with respect to the mootness argument that would affect the trustee differently than Co-America? No, I don't think there's anything different that would affect the trustee. I think I would make one comment to supplement what Mr. Olbrin had to say, and that is to just to point out that you're looking at an integrated financing transaction, and that to try to make the technical argument, if you will, that somehow that did not include the terms for the use of the funds would, in effect, undercut the shoring for the entire agreement in the first place. That's the only thing I would have to add to that. Thank you, counsel. Thank you. Mr. Weinstein. I'd appreciate it if you would comment directly on Mr. Olbrin's argument. Yes. That was at the top of my packet, if I may say so. I made no such concession. I assume that's the point Your Honor was referring to. The good faith is not conceded. What I said was the matter is not moot because if the reversal, if some change, reversal is made with respect to this encapsulated fund, that won't affect. I'm sorry. Let me say it another way, if I may. What 364e protects against subsequent attack on appeal is the establishment and the determination that a lender is entitled to a certain amount of a claim and an identified amount of money and an enforceable lien against collateral to protect that amount of money. There is no dispute that with respect to whatever amount of money at the end of the analysis Comerica has lent postpetition, they have the lien that was given to them and the amount of entitlement to repayment, which is a long way to finish. And there's no showing in this record of absence of good faith, is there? Well, the good faith is not. So far as Comerica is concerned? Well, what's missing is the moving party, which is the trustee, joining with Comerica under the MCAP case, which, again, is in the same letter brief. I apologize. I don't know if I'm apologizing, but I certainly regret that Your Honors don't have it. Don't worry. It's our problem, not yours, believe me. Well, but it's my problem because it does affect how I, you know, respond to Your Honor. There are certain things that I haven't gotten to yet that I really feel are critical. MCAP was a BAP decision that addressed the same mootness issue and said that one doesn't get to good faith by simply observing that there's no evidence of bad faith, but rather one has to, when you're a moving party who's going to expect to rely on either 363M or 364E, one must affirmatively offer evidence of good faith. And in response to the BAP's questions and the BAP's memorandum, they went through and analyzed the same things that they've put to you here. Now, again, of course, Judge Wardlaw is quite correct that you look as if that didn't happen, but on the other hand, there's information to be gleaned. The BAP identified the three declarations, and none of them had anything to do — none of them offered word, one, about what Comerica's involvement was. There was really nothing more than conclusory statements about the need to finish the project. That's a fair summary of what the BAP found in looking at the identified evidence of good faith. And under MCAP, which this Court should find and, frankly, should make the law of the circuit, there has to be a satisfaction of a burden that there's at least some reasonable measure of evidence of good faith. And in this case, that would look like some description in the moving papers of the course of conduct and the course of discussions between the trustee and the bank. Now — So the burden is on the bank to establish good faith? Well, on whatever party is going to intend to rely on the 364e protection. So, yes, it would indeed be the bank joining with the trustee or a debtor in possession, as the case may be in some subsequent case. That's exactly — Does MCAP say that, that the burden is on the lender to establish good faith? Well, I don't know that it uses the word lender. I believe it certainly says that it is on the party looking to use the mootness provision. Yes, it absolutely says that. All right. Anything further? Yes. I would like — I must bring to this Court's attention the fact that there's a certain commercial logic from the bank's standpoint to manipulating and controlling this does not answer at all, and it winds up putting this case directly adverse and directly contravention of this Court's decision in Lazard, which is at 83F3-306, which specifically articulates — You're citing a particular case citation. Is that — does that signify it's not been cited in any of the briefs? No, it is. Oh, it is. But the very important sentence that this Court issued in that — wrote in that opinion is under the Bankruptcy Code, administrative expense creditors must — to use the word — the Court used the word — must be treated equally, and the Court should not set up its own order of priorities. And the exact kind of argument that was made here was answered by two opinions of bankruptcy courts in Preston Lumber and Ben Franklin Retail Store, both of which citations are in our papers. And you can tell by reading those papers that in categorically rejecting that kind of argument, those courts speak with great concern about what those kind of things do to the entire bankruptcy system, that to allow secured creditors to — to adopt a — it makes sense for secured creditors to want to do those things. No one questions that, but the system simply won't allow to — for secured creditors to decide who gets paid with — particularly with money that's being lent to the estate. Ben Franklin Stores addresses that — that — that mantra, if you will, that has been used in this case, that this was the bank's money. It wasn't the bank's money once it was lent to the debtor. And you can't bootstrap into it being the bank's money by saying — by representing with no real evidence, by the way — that the bank wanted it this way. What the bank wanted was the project finished. That it was entitled to do. The bank — we really know the bank would have preferred to have it finished for $888,000 less. But the fact that money was being set aside for administrative expenses makes that issue a bankruptcy code and bankruptcy policy issue. And Lazar specifically says that administrative expenses are a function of the bankruptcy code. The court cannot order its own priorities. And there's certainly no exception. They haven't drawn an exception out of Lazar. They haven't — they can't distinguish it by saying that it somehow doesn't apply here. They simply have said, well, the bank wanted it, and that was the bank's requirement. And bankruptcy changes certain things. And it changes — and it changes the ability of certain entities or constituents to demand certain things that have impacts — too many impacts on others. Now, there are lots of things that can be demanded that are authorized. Or that can be authorized after notice. But if nothing else, this should be recognized as its own separate proceeding. And I want to close with a couple of highlights from the due process issue. Because we unfortunately had to burden the briefs with a real detailed breakdown of these numerous items, because what they said here is there was adequate notice when you cobbled together a variety of different things. And so I went back once more, and I want to bring two highlights to the Court's attention on this notice here. Your time is about to expire, counsel, so please sum up. Okay. I'd like to say, number one, that the 16-day notice with respect to this administrative — this handling of administrative claims is, by definition, insufficient under the rules for motions seeking relief. That's number one. Number two, they issued a notice on January 21, which is an exhibit of tab 13, and they refer back and they pick up exhibit 11, which was a document filed three weeks earlier. What that document speaks — and the issues are the establishment of the expense fund and the usage of the expense fund. The earlier document speaks to separate set-asides, identifies certain money being set aside, but none of that money is for administrative expenses. There are set-aside pockets, and by the same token, what they do say is there's going to be usage of cash collateral to pay the administrative expenses. Cash collateral, that's what was noticed. Cash collateral is not the same thing as postpetition financing. Cash collateral is the expectation that downstream, revenues will result from the liquidation of assets. Counsel, you've gone way over time. Thank you very much. The case just argued will be submitted for decision, and we will take a five-minute recess.
judges: O'scannlain, Wardlaw. Lovell